# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

## CRIMINAL COMPLAINT

vs.

CASE NUMBER: **8 : 13 MJ 1059 AEP**

EMIR PERON, and
ROGER GARY DRIGGERS

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. From an unknown date through and including January 14, 2013, in Hillsborough County, in the Middle District of Florida, the defendant(s) did,

JCD PERON
DRIGGERS

together with persons known and unknown, conspire to distribute and posses with intent to distribute 50 grams or more of methamphetamine,

in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Furthermore, on or about November 19, 2013, December 5, 2012, and January 14, 2013, respectively, in Hillsborough County, in the Middle District of Florida, defendant EMIR PERON did,

possess a firearm in furtherance of a drug trafficking crime,

in violation of Title 21, United States Code, Sections 924(c)(1)(A). I further state that I am a Special Agent with the Bureau of Alcohol Tobacco, Firearms, and Explosives, and that this Complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Signature of Complainant
Special Agent
Jason C. Denham, ATF

Sworn to before me and subscribed in my presence,

January 28, 2013                         at

Tampa, Florida

Anthony E. Porcelli
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Jason C. Denham, being duly sworn, depose and state the following:

## INTRODUCTION

1.     I have been a special agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2007. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program as well as the ATF Special Agent Basic Training program. Prior to my employment as a Special Agent with ATF, I served as a Police Officer for the City of Hattiesburg, Mississippi from 1999 to 2003. Previous to my employment as a Police Officer with the Hattiesburg Police Department, I served in the United States Marine Corps Reserves in the capacity of a Military Police Officer. I am also a graduate of the Hattiesburg Police Academy and the United States Army, Marine Corps Detachment, Military Police Academy. In addition, I am a college graduate with a Bachelor's and Master's degrees in Criminal Justice. Through these programs, I have received extensive education and training as it relates to federal law and violations of federal criminal statutes, in addition to general education in the field of narcotics and violent crime enforcement. From 2007 to the present, I have been assigned as a special agent in the ATF Orlando Field Office.

2.     During my tenure as an ATF special agent, my duties and experiences have included successfully conducting numerous federal firearms and narcotics investigations, executing federal search warrants, serving federal arrest warrants, conducting surveillance operations, conducting interviews, orchestrating undercover operations, and testifying in federal court and before federal grand juries. I have

1

conducted and participated in hundreds of successful criminal investigations, arrests, and prosecutions for violations of the various statutes that ATF enforces, including violations of the federal firearms and narcotics laws. These investigations have included the illegal manufacturing of controlled substances; the illegal distribution of controlled substances; the illegal possession of controlled substances; conspiracies to distribute controlled substances; the use of firearms in furtherance of narcotics violations; counterfeit currency and fraud violations; bank robbery, Hobbs act robbery, and armed carjacking violations; and other firearms violations.

3.    Based on my training and experience, I have become familiar with the manner in which large scale drug traffickers and drug trafficking organizations operate. I have become knowledgeable with the methods utilized in the manufacture, sale, transportation, distribution, and possession of controlled substances. In addition to other matters, I am aware of the following:

(a)    That it is common for drug traffickers to maintain books, records, receipts, notes, and ledgers relating to the purchase, sale, distribution and/or manufacture of drugs;

(b)    That it is common for drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, businesses, and vehicles;

(c)    That it is common for drug traffickers to maintain evidence relating to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds such as: large amounts of United States currency, financial instruments, books, records, bank statements and related records, bank drafts, cashier's checks, keys to safe deposit boxes, and evidence of other financial transactions. These items are maintained within their residences, businesses, safe deposit boxes, safes, storage lockers, and/or locations over which they exercise dominion and control;

(d)    That drug traffickers commonly maintain in books, papers, or electronic formats the names, addresses, and telephone numbers of individuals, associates, co-conspirators, suppliers, underling distributors, and customers who

2

are associated with the drug trafficking activities;

(e)     That drug traffickers commonly store and maintain narcotics and items utilized in the manufacturing, packaging, and distribution of narcotics within their residences, businesses, or other locations over which they exercise dominion and control and to which they have ready access;

(f)     That drug traffickers commonly have in their possession, at their residences, and/or their businesses firearms and related ammunition as common tools of their trade. Said firearms are used to protect and secure drug trafficking activities, narcotics, and drug proceeds;

(g)     That persons who distribute illegal narcotics often utilize cell phones, pagers, and other electronic communication devices to conduct their illegal transactions and to store telephone numbers of their drug related associates. These cellular telephones, pagers, and other electronic communication devices are maintained within their residences and/or other locations over which they exercise dominion and control;

(h)     That drug traffickers often communicate with their drug trafficking associates through the use of cellular and residential telephones and that drug traffickers often change telephone numbers or utilize multiple telephones in an effort to thwart law enforcement's use of electronic surveillance. Frequently, drug traffickers often speak in guarded or coded language when discussing their illegal drug trafficking over the telephone in an effort to further prevent detection: and,

(i)     That in order to conceal their identities and avoid detection from law enforcement, narcotics traffickers often enlist the aid of acquaintances to distribute or store controlled substances or launder drug proceeds on their behalf. Similarly, narcotics traffickers often use the names of these individuals or fictitious names to subscribe to telephone services, purchase property, and rent or register vehicles.

4.     The information contained in this affidavit is based on reports of, and

conversations with, members of law enforcement who participated in controlled

purchases of narcotics and firearms in operations conducted at my direction, a review of

audio/video recordings made during the course of those purchases, surveillance

operations, and information relayed to me by other federal and local law enforcement

personnel. Because this affidavit is being submitted for the limited purpose of

establishing probable cause to support the applications, I have not included each and

3

every fact learned during the course of this investigation.

## PURPOSE OF AFFIDAVIT

5.     The information and facts set forth in this affidavit provide probable cause in support of the following:

1)     United States District Court Criminal Complaint against Emir Peron (a/k/a "JR"; Date of Birth: February 27, 1981; Address: 1602 North Kingsway Road, Seffner, Florida, 33584) (hereinafter, "PERON");

2)     United States District Court Criminal Complaint against Roger Gary Driggers (a/k/a "Gary"; Date of Birth: September 1, 1952; Address: 1402 Clarendon Ave, Lakeland, FL 33803) (hereinafter, "DRIGGERS"); and

3)     United States District Court Search and Seizure Warrant for PERON's residence, located 1602 North Kingsway Road, Seffner, Florida, within the Middle District of Florida.

1.     As detailed below, the requested Criminal Complaints and Search Warrant involve violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 924(c).

## SUMMARY OF INVESTIGATION AND PROBABLE CAUSE

2.     In November of 2012, ATF began an investigation into the alleged continuing criminal activities of PERON and his associates, who were believed to distribute ounce quantities of crystal methamphetamine in and around the Middle District of Florida. Around that time, I received information from registered ATF confidential informant number 767015-165 (hereinafter, the "CI"), who had previously given information on multiple occasions to me that had proven to be both credible and reliable. The CI

4

informed me that he/she is in contact with a white male that the CI knew only as "JR" and who was located in or around Plant City, Florida. "JR," who was later identified as PERON by an undercover ATF agent (as described below), was alleged to be able to provide up to one ounce of crystal methamphetamine. In addition, PERON informed the CI that he could supply him/her with firearms, including automatic weapons, and firearm silencers.

3. A review of a database of the Clerk of the Court of the Thirteenth Judicial Circuit, in Hillsborough County, Florida, reveals that an information was filed against PERON on September 24, 2012, charging him with felony grand theft pursuant to FLA. STAT. § 812.014. This offense is a third degree felony punishable by up to five years imprisonment under Florida law. PERON pled not guilty to that charge on October 26, 2012.

4. On November 15, 2012, PERON sent the CI photographs of firearms, including a photograph of himself holding what appeared to be a semi-automatic pistol with attached silencer, via text message from telephone number (813) 445-1613. The CI advised me that PERON offered to sell the CI and undercover ATF special agent Scott Perala—who was posing as the CI's associate—the pistol with attached silencer and one-quarter of an ounce of methamphetamine. At my direction, the CI set up a meeting with PERON for the afternoon of November 15, 2012, in order to purchase the pistol, silencer and methamphetamine. On the morning of November 15th, while discussing potential meeting places with the CI, PERON provided his address as 1602 Kingsway Road, Seffner, Florida, and told the CI, in substance, that he would prefer to sell the methamphetamine and firearms at his home because he potentially had to watch his

5

children and he also did not want to travel with the items. Nevertheless, PERON eventually agreed to meet the CI off an exit on Interstate-4 in the East Tampa/Plant City area.

5. ATF Task Force Officer ("TFO") Craig Carson thereafter reviewed multiple law enforcement research tools, in an attempt to locate individuals associated with the address of 1602 North Kingsway Road, Seffner, Florida. TFO Carson was able to determine through an Accurint check that Emir Peron Jr. was listed as a current occupant at that residence. A review of TECO utility records for 1602 North Kingsway Road, Seffner, Florida, revealed that PERON is registered for service at that address. A review of Hillsborough County Property Appraiser records for 1602 North Kingsway Road, Seffner, Florida, also revealed that an "Edemir Peron" is the owner of that address. TFO Carson then forwarded to me a driver's license photograph and information from the Florida Department of Motor Vehicles. That photograph appeared to be consistent with the text message pictures that PERON had previously sent the CI. I then showed SA Perala PERON's Florida driver's license photograph, as well as the photographs PERON sent to the CI.

6. At approximately 2:45 p.m., SA Perala and the CI arrived at the Travel Centers of America Truck Stop located at 11706 Tampa Gateway Boulevard, in Seffner, off of exit 10 on Interstate-4. This location is within the Middle District of Florida.

7. At approximately 3:21 p.m., the CI, while seated inside the truck stop with SA Perala, observed PERON walking through the parking lot area of the truck stop. SA Perala and the CI then walked and met PERON. The CI engaged PERON in conversation, calling him "JR," and introduced SA Perala, who immediately recognized

6

PERON as the same subject he had seen in the photographs shown to him earlier. PERON thereafter stated that he had the pistol and silencer, but did not yet have the methamphetamine available. PERON guided SA Perala and the CI over to a black Ford, F-150, pick-up truck bearing Florida tag AQQ-V40, that was parked at a gas pump. PERON opened the passenger door of the truck and showed SA Perala two rifles that were laid across the front seat and covered with a towel. PERON described the rifles as an AR style rifle and SKS rifle. SA Perala recognized the AR type rifle as being similar to one of the rifles captured in a photo that PERON had sent to the CI.

8.    SA Perala told PERON he was interested in the handgun with the silencer. PERON removed a pistol from his shorts, along with a Crown Royal bag. PERON worked the slide of the pistol, which was loaded, in front of SA Perala. PERON allowed SA Perala to examine the pistol, then removed a second threaded barrel for the pistol and what looked like a silencer or flash suppressor from the Crown Royal bag. SA Perala examined what PERON identified as a silencer and told PERON it looked more like a flash suppressor. PERON advised that the silencer reduced the noise of the firearm by about 20 percent. PERON advised SA Perala that he wanted $400 for the firearm and the threaded barrel and silencer/flash suppressor. During the course of their conversation, a male, later identified as Christopher Locke, arrived at the truck as well.

9.    PERON, SA Perala and the CI then went to SA Perala's undercover vehicle. While standing outside the vehicle, PERON again unloaded the pistol and stated, "Always loaded, one in barrel." PERON handed the pistol to SA Perala, along with the threaded barrel, silencer/suppressor and an extra loaded firearm magazine, and SA

7

Perala gave PERON $400.

10.      After selling the pistol, PERON discussed the quarter ounce of methamphetamine, saying that he need at least 30 minutes to obtain it. PERON advised that he had just sold three ounces of methamphetamine thirty minutes ago, and said that he wanted $550 for the quarter ounce of methamphetamine. PERON showed SA Perala a large stack of money that he had in his back pocket, and further discussed his possession of fully automatic weapons, including an M-11.

11.      Later that day, while travelling to meet with cover team members, the CI made telephone contact with PERON, who advised that he could not obtain the methamphetamine, but would have it the next time SA Perala and the CI came over to meet him.

12.      SA Perala turned over the pistol purchased from PERON, along with the additional threaded barrel and silencer/supressor and extra magazine to me for inventory. The pistol is described at this time as an unknown manufacture, black, 9x18 semi-automatic pistol bearing serial number KT213192. The suspected suppressor was submitted to the ATF Firearms Technology Branch for a determination to its effectiveness in reducing muzzle audio signature, with no report available at the time of this affidavit.

13.      On November 17, 2012, SA Perala again made recorded undercover telephone contact with PERON at telephone number (813) 445-1613, and discussed the purchase of a half ounce of methamphetamine and a rifle. SA Perala made tentative arrangements to meet PERON on November 19th. On November 18, 2012, SA Perala again made recorded telephone contact with PERON and confirmed the meeting for the

8

next day, and discussed the possible purchase of an alleged MAC-11 machinegun through an unknown associate of PERON's.

14.    On November 19, 2012, at approximately 4:00 p.m., SA Perala arrived at the Travel Centers of America Truck Stop located at 11706 Tampa Gateway Boulevard, , in Seffner and made telephone contact with PERON. PERON attempted to have SA Perala meet him at his residence, advising that he lived at 1602 North Kingsway Road, in Seffner. PERON agreed to meet SA Perala at the truck stop, but said that he would have to wait for a ride.

15.    At approximately 4:25 p.m., SA Perala observed the same black Ford F-150 pick-up truck from the prior buy, which later pulled up next to SA Perala's undercover vehicle. PERON then opened the passenger door of the truck, and SA Perala could observe that Christopher Locke and a young child were inside the passenger compartment of the truck as well.

16.    After discussing the sale of the MAC-11 machinegun with SA Perala, PERON got out of the truck and handed SA Perala a white plastic bag containing a crystalline powder/substance. PERON said that the package contained the half ounce of methamphetamine and told SA Perala to examine the contents. PERON advised that he had used some of the same methamphetamine and that he was awake for two days and was about to collapse. SA Perala gave PERON $1,000 for the methamphetamine and asked PERON if he had the rifle. PERON advised that he did have it, and thereafter placed the rifle in the rear seat of SA Perala's vehicle. SA Perala then gave PERON $700.

17.    After some additional discussion about the MAC-11, SA Perala asked PERON

9

about the price for a whole ounce of methamphetamine. PERON advised that an ounce of methamphetamine would cost $1,800.

18.     SA Perala then met with cover team members at a predetermined location. On the way to the cover team, PERON called SA Perala and advised that he had forgotten about a small amount of marijuana that he had concealed inside the pistol grip of the rifle. PERON told SA Perala that he didn't want SA Perala to get stopped and not know the marijuana was concealed in the grip. SA Adam Black later processed and inventoried the suspected methamphetamine, which weighed approximately 14.8 grams with packaging material. TFO Carson later conducted a field test of the substance, which tested positive for the presence of methamphetamine. SA Black later processed the rifle, which is further described as a Saiga 5.45x39mm semi-automatic rifle made by Izhmash in Russia, bearing serial number H09885500L. SA Black also inventoried a small amount of marijuana in a cellophane wrapper that was recovered from inside the rifle's pistol grip.

19.     In my capacity as a firearms expert, as certified by ATF in my capacity as an Instate Nexus Expert and a graduate of ATF's Firearms Interstate Nexus Training, relative to the identification, date and place of manufacture of firearms and ammunition, from the information furnished, as well as my training, research, knowledge, and experience, I have determined that the firearm purchased from on this date from PERON by SA Perala is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and was manufactured after 1898.

20.     On November 27, 2012, SA Perala recorded an undercover phone conversation with PERON at telephone number (813) 516-5455, during which PERON discussed

10

selling SA Perala a Springfield 9mm pistol and one ounce of methamphetamine. PERON advised that the one ounce of methamphetamine would cost $1,800. SA Perala told PERON he would meet with him on November 29, 2012.

21.     On November 29, 2012, at approximately 2:15 p.m., SA Perala, SA Black and TFO Nellie Woodruff arrived at the Travel Centers of America Truck Stop located at 11706 Tampa Gateway Boulevard, in Seffner. SA Perala then attempted to make contact with PERON via phone. At around the same time, a Drug Enforcement Administration ("DEA") surveillance team was operating at the direction of SA Morris Moody. At approximately 3:20 p.m., SA's Kevin Clark and Robert Robbins observed a green pick-up truck, bearing Florida plate 764-VRH, leave 1602 North Kingsway Road, in Seffner. The truck, registered to Anthony Chwalek of 107725 Gutherie Lane, Thonotosassa, Florida, was occupied by three white males and was seen stopping in front of a residential address in Seffner, before returning to 1602 North Kingsway Road.

22.     At approximately 4:25 p.m., SA's Clark and Moody saw the truck leave that address once again. They also saw a white PT Cruiser, bearing Florida plate MXR-125, depart PERON's neighborhood behind the green truck. This PT Cruiser is registered to Carla Newsome of 8430 Wire Road, Zephyrhills, Florida. At around the same approximate time, SA Perala received a text response from PERON that he had fallen asleep but was prepared to meet. PERON agreed to meet SA Perala at the truck stop and advised several times via text that he was on his way to meet SA Perala.

23.     At approximately 4:35 p.m., SA Perala observed PERON at the Travel Centers truck stop. A short time later PERON walked over to SA Perala's undercover vehicle. After getting into the vehicle, PERON explained that he was unable to get the firearm,

11

but that he had 12 grams of methamphetamine that he could sell. PERON then produced a small white plastic bag containing a crystalline/powder substance that he placed on SA Perala's center consol. PERON indicated to SA Perala that he had used the methamphetamine earlier and was awake for two nights due to its potency. SA Perala weighed the suspected methamphetamine on a digital scale, which showed approximately 12.1 grams. SA Perala then paid PERON $640.

24. PERON apologized for not being able to obtain the ounce of methamphetamine or firearm, and offered to drive the items to SA Perala later that evening. After finishing the meeting, I saw PERON walk back across the parking lot to the same white Chrysler PT Cruiser. PERON entered the car and was later seen by SA's Moody and Clark driving back to 1602 North Kingsway Road.

25. SA Moody later processed and inventoried the suspected methamphetamine. Based on his training and experience in methamphetamine investigations, as well as the appearance of the substance, SA Moody believes that the substance does, in fact, contain methamphetamine.

26. On December 4, 2012, SA Perala had a phone conversation with PERON at telephone number (813) 445-1613, during which PERON discussed the sale of an ounce of methamphetamine for $1,800, as well as a MAC-11 pistol. Later that evening, SA Perala again spoke with PERON via phone and arranged to meet with him on December 5th, in Seffner.

27. On December 5, 2012, SA Perala spoke with PERON and told him that he could meet at the Travel Center truck stop. PERON requested that SA Perala meet him at his residence to conduct the transaction because the deal involved a larger amount of meth

12

and PERON was wary of driving with it. PERON then texted SA Perala his address, as "1602 N. Kingsway Dr., Seffner, FL."

28.    At approximately 12:45 p.m., SA Perala, accompanied by SA Black and TFO Woodruff, arrived at 1602 Kingsway Drive, in Seffner. 1602 Kingsway Drive is a trailer-style home, set atop blocks, which is set back off the road behind a 6 foot wooden fence with a cattle gate. SA Perala parked his vehicle in the yard and waited for PERON to arrive. SA Perala noted that the same green Ford F-150 truck, bearing Florida tag 764-VRH, from the November 29th controlled purchase was parked in the yard.

29.    At approximately 12:53 p.m., SA Perala observed PERON arriving at the residence as the front passenger of a Nissan truck, bearing Florida tag 487-WSB, which was observed being driven by an older white male subject, later identified as DRIGGERS. PERON got out of the car and met with SA Perala. When SA Perala asked about the firearm, PERON patted his chest and showed SA Perala a strap around his neck indicating that the gun was concealed under his shirt. PERON then invited SA Perala inside the house.

30.    Once inside, PERON was describing the property and told SA Perala that he had purchased the mobile home and property for $70,000 in cash. PERON advised that he had divided the trailer into two residences and that he had done his own remodeling.

31.    DRIGGERS eventually came inside the house and joined them. PERON thereafter unloaded the M-11 pistol, which had one round in the chamber, and then handed it SA Perala to examine. PERON then offered to let SA Perala shoot the firearm out in his yard. During their conversation, DRIGGERS advised that he was 61 years old. PERON then produced a plastic sandwich baggie containing a pink

13

crystalline/powder substance. PERON set the baggie on the counter and then went to retrieve a digital scale to weigh it. DRIGGERS then stated, in substance, that he was providing the methamphetamine to PERON and that he was expecting approximately a gram out of the package because PERON was buying one and a half ounces of the methamphetamine. SA Perala responded that he thought he was obtaining two ounces of methamphetamine. DRIGGERS replied, "I didn't have it. I'm going after it right now." PERON then motioned to SA Perala with his hand, indicating that he should not worry about DRIGGERS' comment.

32. PERON then weighed the methamphetamine on a scale and called out to a female inside the house. A young white female in her mid to late teens then came out of the bedroom area carrying a plastic container that she gave to PERON. PERON opened the container and removed two packages of suspected methamphetamine that was also a pink crystalline/powder substance. DRIGGERS said that the scale read "43.6 grams." PERON then added the additional two packages of methamphetamine and indicated that the scale now indicated 54 grams. While PERON was weighing and packaging the methamphetamine, DRIGGERS stated that he was about to go pick up a pound of meth. DRIGGERS stated that he and another person had just finished selling "five" each, which SA Perala understood to be five ounces of methamphetamine. SA Perala then asked DRIGGERS if he cooked the methamphetamine and he responded that he didn't cook methamphetamine and that, "I made enough trips to prison." DRIGGERS proceeded to describe himself as a dealer and talked about driving around to make sales. DRIGGERS also explained how he conceals methamphetamine inside a drink container while driving.

14

33.    SA Perala asked about the pink color of the methamphetamine and both
DRIGGERS and PERON indicated the methamphetamine was uncut and very pure.
PERON advised that the methamphetamine was stronger than he liked and that it was
highly potent. DRIGGERS stated the he does not cut the methamphetamine that he
sells, stating, "I give you a good product and I just want my, you know to get paid for it."

34.    SA Perala then left to get money to buy the methamphetamine and pistol. When
he returned, PERON said that he wanted $550 for the M-11 pistol and that he had to do
the math on the methamphetamine because it was two grams short of two ounces.
PERON thereafter gave SA Perala the M-11 pistol and the methamphetamine that had
been weighed. SA Perala later gave PERON $4,020 for both items.

35.    PERON later told SA Perala that he was going to take the money, along with
additional money displayed in a large roll, and purchase additional quantities of
methamphetamine from DRIGGERS. PERON explained that he had customers lined
up in Tennessee that would pay $2,400 per ounce for the methamphetamine. PERON
advised that he was going to obtain as much methamphetamine as the money from SA
Perala and his own cash would purchase and travel directly to Tennessee to sell it.
PERON said that he would be returning directly to Florida after making the
methamphetamine sales in Tennessee.

36.    SA Perala, PERON and DRIGGERS then talked about the price of
methamphetamine in different areas. DRIGGERS stated that he had a customer that
sold ounce quantities of methamphetamine to customers in Orlando for $1,900 per
ounce, saying, "The guy runs 'em from me over to Orlando."  SA Perala asked
DRIGGERS about purchasing larger quantities of methamphetamine to traffic to

15

Chicago. SA Perala asked DRIGGERS how much a pound of methamphetamine would cost and DRIGGERS said he would check on a price. Both DRIGGERS and PERON then explained that it would be cheaper if SA Perala would provide them with the money up front, which would allow them to go directly to the source without having to use their own money. DRIGGERS also explained that he obtains his methamphetamine from a source who is linked directly to an unidentified subject that brings the methamphetamine from Texas through the use of couriers. DRIGGERS advised that he used to be a courier for the same unidentified male subject and that he would pick up a vehicle in Texas that had hidden compartments containing the methamphetamine. DRIGGERS stated that he was paid $6,000 for driving the vehicle with methamphetamine back to Florida, but that it wasn't worth it to him because of the large amounts of methamphetamine inside the vehicle. DRIGGERS said he preferred to just drive around selling smaller amounts of methamphetamine locally.

37.    SA Perala, SA Black and TFO Woodruff later met with cover team members at a predetermined location. SA Moody later processed and inventoried the suspected methamphetamine. SA Moody also conducted a field test of the substance, which tested positive for the presence of methamphetamine. SA Perala turned over the M-11 pistol to me, which is further described as an SWD Industries, Model M-11, 9mm pistol bearing serial number 87-0007188.

38.    In my capacity as a firearms expert relative to the identification, date and place of manufacture of firearms and ammunition, from the information furnished, as well as my training, research, knowledge, and experience, I have determined that the firearm purchased from on this date from PERON by SA Perala is a firearm as defined in Title

18, United States Code, Chapter 44, Section 921(a)(3), and was manufactured after 1898.

39.     Following the undercover purchase PERON sent a text message to SA Perala stating, "Good busness." PERON then apologized for the previous deal when he took so long to meet with SA Perala, and also stated, "I fell bad. U see what my boss sad. I am the best." SA Perala believed that this statement was in reference to DRIGGERS telling SA Perala that PERON was one of his best customers.

40.     At approximately 1:25 p.m., Detective Scott Morrill of the Hillsborough County Sheriff's Office saw DRIGGERS' truck leave the house and travel southbound on Kingsway Road. At approximately 1:32 p.m., the truck stopped at a McDonald's located at Interstate-4 and McIntosh Road. Several minutes later, DEA TFA Frank Capitano saw a gray Honda arrive in the McDonald's parking lot and park beside the truck. TFA Capitano observed the driver of the Honda, identified by DEA TFA Ryan Kmiec as the registered owner, Charles Nowling. DRIGGERS and NOWLING met for approximately 40 minutes in the parking lot. In that time, NOWLING entered DRIGGERS' truck on several occasions and Hillsborough County Detective Goff observed DRIGGERS counting money during the meeting.

41.     Over approximately the next five hours, surveillance team members saw DRIGGERS drive to various locations in Lakeland and Bartow, meeting with several people. Some of those people briefly entered his truck and then got out. Based on my training and experience, as well as conversations with DEA agents involved with this investigation, I believe that such repeated behavior is consistent with likely drug sales or an exchange of drug by DRIGGERS inside the truck.

42.     At approximately 5:47 p.m., DEA TFA Keith Mease contacted a marked patrol

unit to assist in a traffic stop on DRIGGERS in order to identify him.  Deputy Sirera of

the Polk County Sheriff's Office stopped the truck at the intersection of 92 Highway and

Fish Hatchery Road, in Bartow.  DRIGGERS gave his driver's license and registration to

Deputy Sirera and the deputy returned to his vehicle to conduct a records check.  Upon

returning to DRIGGERS' truck, the deputy asked DRIGGERS to exit the vehicle, at

which point DRIGGERS put the truck in drive and rapidly drove away from the scene.

Surveillance on DRIGGERS was then terminated.  Deputy Sirera maintained custody

and possession of DRIGGERS driver's license and vehicle registration, which were later

transferred to DEA TFA Mease.

43.     On December 7, 2012, SA Perala identified DRIGGERS from a photographic

array.

44.     On December 12, 2012 SA Perala made a recorded undercover telephone call to

PERON at telephone number (813) 445-1613.  During the conversation, PERON

discussed possibly having a Smith & Wesson pistol to sell.  PERON also discussed

sawed off shotguns with SA Perala.  PERON later sent several text messages to SA

Perala indicating that he had Oxycodone pills, which he referred to as "blues" and

"30's," for sale as well.

45.     On January 9, 2013, SA Perala communicated via text message with PERON,

during which he and PERON spoke about meeting the following week to purchase

methamphetamine and possibly firearms.

46.     On January 11, 2013, SA Perala made a recorded undercover telephone call to

PERON at telephone number (813) 445-1613.  During this conversation, PERON

discussed the sale of two ounces of methamphetamine and a .357 magnum revolver and scheduled a meeting for January 14, 2013. On January 13, 2013, SA Perala again spoke with PERON via phone, and PERON stated that he had a court appearance the next morning, and was concerned about being sent to prison. Because of his pending case, PERON arranged for SA Perala to obtain the methamphetamine and firearms from his girlfriend at his residence at 1602 North Kingsway Road, if necessary.

47. On January 14, 2013, at approximately 2:52 p.m., SA Perala and TFO Woodruff arrived at 110 Old Hillsborough Road, in Seffner, FL, where PERON was waiting in the driveway. PERON then got into SA Perala's undercover vehicle and they travelled to 1602 Kingsway Road. PERON advised that he only had approximately one ounce of methamphetamine for SA Perala and that he was unable to obtain more methamphetamine because his source's phones were off. PERON advised that DRIGGERS was not his source for methamphetamine and was simply a driver.

48. Upon arriving at 1602 North Kingsway Road, PERON had SA Perala and TFO Woodruff accompany him into the north end of his home, which is divided in half by a wall. SA Perala noted that PERON had an active video surveillance system inside this room which displayed video from two angles of the yard of his property. PERON went to a room in which there was a large gun safe. PERON opened the safe and retrieved a Smith & Wesson .357 magnum revolver. PERON handed SA Perala the revolver and said that he would sell it to him for $250. PERON also removed a Mossberg .22 caliber rifle from the safe, which he handed to SA Perala to examine. PERON said that he wanted $150 for the rifle. PERON also handed SA Perala a Ruger .22 caliber revolver that he advised was for sale, but said that he did not know how much the person who it

19

belonged to wanted for it. PERON later indicated that the revolver belonged to his methamphetamine source. PERON further showed SA Perala an RG Industries .38 caliber revolver that PERON said that he could not sell because he had taken it as collateral for a methamphetamine sale. PERON also showed SA Perala what he described as a military explosives detonator of some type. SA Perala examined the item, which appeared to be a military radio controlled detonator for initiating electronic blasting caps.

49. PERON thereafter stated that the methamphetamine was at another location on the property and then exited the trailer with SA Perala and TFO Woodruff. Outside the trailer, PERON challenged SA Perala as if he could be affiliated with law enforcement. PERON advised that he really did not know SA Perala well and that he could not get in touch with a person who could confirm the subject that introduced SA Perala to him. PERON stated, "I know I can get fucked by life for mixing these with that shit," which SA Perala understood to mean selling guns and methamphetamine together. SA Perala then placed the Smith & Wesson revolver and Mossberg rifle inside his undercover vehicle. PERON proceeded to bring SA Perala to a shed on the west side of his yard. PERON then removed some cement blocks on the nearby ground revealing a package that was wrapped in a plastic bag and duct tape. PERON took the package inside the shed with SA Perala, which he unwrapped to reveal two plastic containers.

50. PERON removed a small plastic container that contained a crystalline/powder substance, and advised that there was approximately 24 grams of methamphetamine inside. He then placed the methamphetamine on a sheet of aluminum and SA Perala's digital scale to get a more accurate weight of the methamphetamine, which showed a

weight of 23.7 grams. PERON also opened a larger plastic container which contained some marijuana and a smaller plastic bag containing several prescription pills. PERON offered to sell SA Perala 10 orange pills, which he referred to as similar to Xanax, for a total of $15, as well as four oxycodone pills which he referred to as "blueberries" for $18 per pill. SA Perala thereafter paid PERON $1,950 for the methamphetamine, pills and two firearms.

51.    PERON then agreed to take SA Perala and TFO Woodruff to the house of his methamphetamine source. Prior to leaving, PERON went back into the north side of the trailer to retrieve a .22 caliber Ruger revolver that PERON said he would sell to SA Perala if the source were able to name a good price for it. SA Perala, PERON and TFO Woodruff thereafter left the residence. While driving PERON said that he saw a suspicious white van following them and directed SA Perala to pull down a side street off of the highway. After observing the van a second time, which was an ATF cover team vehicle, PERON again directed SA Perala down a side street where PERON asked SA Perala to drop him off. PERON asked SA Perala to give him the methamphetamine and pills so that SA Perala would not get stopped by law enforcement in possession of the firearms and narcotics. PERON stated, "It's a bad combination of guns and the other shit." SA Perala told PERON that he would take care of it, and PERON then got out of the vehicle with the .22 caliber Ruger revolver.

52.    SA Perala and TFO Woodruff later met with cover team members at a predetermined meet location. SA Moody processed and inventoried the suspected methamphetamine and prescription pills. The pills are further described as 10 orange oval pills marked G3720 and four round blue pills marked 031, which are standard pill

identification markings for alprazolam and oxycodone, respectively. SA Moody also conducted a field test of the suspected methamphetamine, which field tested positive for the presence of methamphetamine.

53.    SA Perala turned over the two firearms to me. The firearms are further described as a Smith & Wesson, Model 19, .357 magnum revolver bearing serial number 48K7667, and a Mossberg, Model 151M-B, semi-automatic .22 caliber rifle with no serial number.

54.    In my capacity as a firearms expert relative to the identification, date and place of manufacture of firearms and ammunition, from the information furnished, as well as my training, research, knowledge, and experience, I have determined that the Smith and Wesson Model 19 .357 magnum revolver purchased from PERON by SA Perala on this date is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and was manufactured after 1898.

55.    At approximately 6:39 p.m., SA Perala made a recorded undercover telephone call to PERON. PERON told SA Perala that he had learned that DRIGGERS had been arrested during a traffic stop and was found with methamphetamine. According to records from the Polk County Sherriff's Office, DRIGGERS was arrested on or about January 13, 2013, in connection with methamphetamine trafficking and other charges. PERON told SA Perala that the earlier law enforcement surveillance was most likely related to DRIGGERS' arrest.

## CONCLUSION

56.    As detailed above, there is probable cause to believe that PERON and DRIGGERS have committed violations of Title 21, United States Code, Sections

22

841(a)(1) and 846, within the Middle District of Florida. There is also probable cause to believe that PERON has committed violations of Title 18, United States Code, Section 924(c), within the Middle District of Florida.

57.    Furthermore, based on the above facts, there is probable cause to believe that PERON routinely distributes methamphetamine and prescription pills directly from his residence, located at 1602 North Kingsway Road, Seffner, Florida. Specifically, this belief is supported by the controlled purchases which occurred at that location on December 5, 2012 and January 14, 2013, as well as PERON's statements to SA Perala in which he requested that the methamphetamine sales take place at his residence. Moreover, given PERON's actions during the January 14th buy, there is probable cause to believe that methamphetamine and prescription pills, as well as evidence of his trafficking in those substances, are located not only inside of the residence itself, but inside of the structures and vehicles located on the property as well.

58.    Based on my training and experience, I know that narcotics traffickers routinely secrete, store and maintain inside of their residences the fruits and instrumentalities of their drug trafficking activities, including but not limited to money and proceeds, telephones, phone records, firearms, ammunition, safes, ledgers, scales, packaging material, cutting agents, drug paraphernalia, and records of their drug trafficking communications and activities. In this case, there is probable cause to believe that PERON stores such items inside of his residence, as well as inside of the structures and vehicles located on the property.

59.    Additionally, there is probable cause to believe that PERON illegal stores and possesses firearms at the 1602 North Kingsway Road property. Based on my training

23

and experience, I also know that individuals who possess firearms, including those who possess and/or use firearms illegally, routinely secrete, store, and maintain those firearms, ammunition, receipts, firearm boxes, and firearm accessories inside their residence, inside their vehicles, inside structures on their residential property, and/or on their person. Based on my training and experience as an ATF special agent, I know that there are very few major firearm manufacturers and no commercial ammunition manufacturers located in the State of Florida. Thus, it is more likely than not that firearms observed in PERON's possession, and definitely the accompanying ammunition, were manufactured outside of Florida. Therefore, the firearms and ammunition would have affected interstate commerce and crossed state lines by their mere presence in Florida. What is more, based on the evidence of PERON's methamphetamine trafficking, which has occurred concurrent with and in furtherance of his possession of firearms in this investigation, there is probable cause to believe that any firearms found on the property may involve violations of Title 18, United States Code, Section 924(c)(1)(A).

60.    PERON has also routinely used telephones to conduct narcotics trafficking communications with an ATF undercover officer, both through phone calls and text messages. Both the ATF undercover officers and surveillance units have observed PERON utilizing a phone while within his residence to facilitate apparent drug transactions. Therefore, there is probable cause to believe that telephones used by PERON to facilitate his narcotics and firearms trafficking activities will be located within his residence. Accordingly, there is probable cause to believe that evidence of the commission of narcotics and firearms offense under Title 18 and Title 21, United States

Code, will be found therein.

61.    Based on my training and experience, I also know that narcotics traffickers often make notes and keep ledgers of their narcotics trafficking activities, which include information about suppliers and customers, prior transaction, currency amounts, and quantities of narcotics available, purchased, and sold. These notes are routinely maintained within residences, especially when narcotics trafficking communications and activities also take place there, because the narcotics traffickers make and maintain contemporaneous notes during these activities.  I am therefore also requesting authorization to seize and examine any such notes, ledgers and other related records.

62.    For all of the above reasons, I believe that probable cause exists that evidence of the aforementioned violations, as detailed in ATTACHMENT B, is now present inside of PERON's residence at 1602 North Kingsway Road, Seffner, Florida, which is more particularly described in ATTACHMENT A. Therefore, I respectfully request that the Court issue United States District Court Criminal Complaints for PERON and DRIGGERS, and a United States District Court Search and Seizure Warrant for the search of 1602 North Kingsway Road, Seffner, Florida.

FURTHER AFFIANT SAYETH NAUGHT.

Jason Denham
Special Agent, ATF

Subscribed and sworn to before me
This 29th day of January, 2013.

Honorable Anthony E. Porcelli
United States Magistrate Judge

26